Good morning, Your Honors, and may it please the Court, Jordan Goldberg for Petitioners. Section 1159B gives the Executive Branch discretion to adjust the status of any alien granted asylum before or after termination of that asylum. That follows from three key points. First the text. All agree that the core term granted asylum here can refer to a past completed grant of asylum rather than a continuing status. When someone's granted asylum, does someone acquire something? A person will have a grant of asylum. They acquire a right to stay. Sorry, Your Honor? They acquire a right to stay, correct? Right. The government cannot remove them. They gain the ability to work in this country, and they gain the authorization to travel with the Attorney General's permission. So asylum is a bundle of rights, asylum status? Asylum does confer certain rights on a noncitizen. And if someone loses those rights, do they still have asylum status? No. Their asylum at that point has been terminated. So they've lost that bundle of rights, right? They've lost that bundle of rights under Section 1158, and that's clear from the context in that statute. 1158C3 tells us that the Attorney General shall remove a noncitizen after termination. Which is the way the statute is, is that the fact that it previously was granted that somehow makes them eligible for adjustment. I think that's right, and I think that's because we all agree that in 1159B2, Congress did use the phrase granted asylum, not to refer to a continuing status, but to refer to the fact of a noncitizen having once been granted asylum one year prior. And I think with that, the government then turned to the words status and adjust. But those arguments can't do the work the government asks of them. That's because neighboring adjustment provisions, as well as this Court's discussion in the Adams case. What sense does it make if someone's granted asylum status and they commit a serious offense, such that their asylum status is then taken away and is adjudicated? What sense does it make to equate them as having continued to enjoy the benefits of that bundle of rights that they no longer hold? So you think, first of all, there's I'm not asking about text. Sure, right. Because, you know, plain language is a slippery slope. It all depends on who's the radiator sometimes. And so arguments can be made on either side about what this text means. And you're both, you're all good lawyers, and it's very well briefed. Thank you. Compliments to all of you. Thank you very much. Okay. But we have to make sense of it. And so I'm trying to make sense of why Congress would allow someone who's lost something to have the benefit of previously having had it. I think there are a couple of key reasons. And so, first, I just want to address the category of persons other than the ones that you mentioned, those who committed misconduct. And I'll come back to those. But there are people who will lose asylum through no fault of their own, setting aside any misconduct. There's derivative asylees, and I think it's perfectly reasonable for Congress to have wanted to allow those individuals who didn't engage in any misconduct to adjust even after termination due to their parent or spouse engaging in misconduct. But second, I think even for those who did engage in misconduct, first of all, there will be another bar in almost every case under B-5. Congress clearly thought about this because in Section 1159, B-5, Congress required, again, explicitly, that noncitizens be admissible. And if you turn to Section 1182, which is the provision that deals with, it lists, you know, a whole lot of grounds for inadmissibility, many of those have to do with criminal misconduct. And that will be a bar in many cases. But we also know from Subsection C, back in the adjustment provision, that Congress intended for the Attorney General, even in those cases where B-5 otherwise would impose a criminal bar or a bar for criminal misconduct, to waive that inadmissibility in cases involving humanitarian, public interest, and family unity concerns. And it might be worth just noting quickly some of the things that Congress did want the Attorney General to be able to excuse if they presented a bar under the — Right. I mean, there's international child abduction. There's totalitarian party membership. There are a few things where Congress sort of drew the line, and it was like persecution, genocide, serious drug trafficking. But we think for the mine run of criminal misconduct, Congress clearly envisioned the Attorney General being able to exercise discretion. And I think that's also worth pausing on here. This is all discretionary. No one is ever going to automatically get a grant of adjustment in this context simply because this Court rules that it's available. Congress trusted the executive branch to make these case-by-case determinations where humanitarian interests, where family unity interests were at play. And on the government's view, that all goes out the window simply because an I.J. happened to decide the termination question and terminate asylum before adjustment. So taking, I think, Mr. Wasiley's case here as just one example, I think we all agree that if the Attorney General, if the I.J. here had simply adjusted status before terminating asylum, we wouldn't be here. Mr. Wasiley would have received a grant of adjustment and not been ordered removed from this country. It's just the pure happenstance that the I.J. here, who believed he could come back and then grant adjustment and ultimately did, finding humanitarian interests and family unity interests, counseled that result. Well, the results are making sense of it. Right. And I suppose then the question is, is if there are two reasonable interpretations as to what granted status means, then your position then is, I mean, and maybe it comes from having served in the state legislature once upon a time and saw the sausage being made. Sure. I'm not such a plain language guy because, frankly, the legislators generally are not all that aware of what they're doing. But I hate to say this, but it's true. No comment, Your Honor. But in any event, if there are two interpretations of the language, your view is that yours makes the most sense because the workaround, which is the use of the waiver in advance of doing the termination of the asylum status, is available and but seems like a magic door for only those who are well-counseled enough to anticipate it. Well, I think it shows that, I mean, not to fight the premise that Congress doesn't always know what it's doing, but I think it shows that in these contexts, Congress envisioned the attorney general having a lot of discretion to deal with these tough cases. The IJ held that it's a really close case here in Mr. Wassily's case. But Congress trusted the executive to make those kinds of decisions. Well, what about somebody who's been on the lam for 10 years, who's finally caught up with it in the removal proceedings or loses their asylum status and then somehow slips back into the crowd? So anyone who's, regardless of how long they've been gone, is eligible? Well, sir, there is no time limit on moving, on seeking adjustment. And unless, you know, a categorical bar that the attorney general lacks authority to waive under subsection C applies, then, yes, the attorney general would have discretion. It may be, you know, wildly unlikely for an IJ to grant adjustment of status in cases of, you know, very severe misconduct because not only do they need a waiver, they discretion of the attorney general. And I just want to back up. We skipped from, I think, the sort of prefatory clause of B, the granted asylum phrase, to the sort of broader structure of what Congress might have been doing here. But there's a lot of other text in Section 1159 that I think is key to understanding the issues in this case. Three times in Section 1159, Congress imposed a clear, explicit, continuing, timing-based status requirement. In 1159b3, Congress said that an applicant for adjustment must continue to be a refugee. In 1159b5, Congress required that a noncitizen be, as we were just talking about, admissible at the time of examination for adjustment. And in Section 1159a1a, Congress required for refugees, for those admitted under Section 1157, that their admission, quote, has not been terminated. This was a Congress that was clearly aware of the relationship between status, adjustment, and termination. And I think against that backdrop, the omission of a explicit, express, continuing asylum requirement is best understood as a purposeful, conscious decision, and that for all the reasons we just said. Go ahead. Okay. Along that line, we hear two competing explanations of this language. It's parenthetical in the Immigration Act of 1990, regardless of whether or not such a settlement had been terminated. Oh, right. Yes. I've read — I know you both briefed this, but could you, like, tell me again your view on that? Because I'm struggling with that. Yeah, of course, Your Honor. I think — just to start off, I think — so the 1990 Act was dealing with a very different — a very specific problem 10 years after this Act was enacted. So we think the best evidence comes from the 1980 enactment, but to the extent 1990 bears on this, we do think it favors petitioners. And just some background on that, on that Section 104. In 1990, the key problem that I think Congress was addressing — and this isn't in the brief, it was just a student note that I read in the Procuring Court in it — communist regimes around the world were falling, and there were significant country condition changes going on, such that many asylees who are in this country face the possibility that with democratic regimes coming to power around the world and the former Soviet Union and elsewhere, they would no longer qualify for that B-3, continues-to-be-a-refugee-under-1101A42A requirement, because they wouldn't reasonably fear persecution at home. And that was the problem Congress was really focused on. It said, you know, but for B-3 and B-2, you'd be eligible to adjust. And it did impose a time limit on that. It said this only applies to those who were granted asylum before the enactment of this Act. And then in the parenthetical, did say, regardless of termination. We think there are two key points about that parenthetical. One — and again, this is not in the briefing, but the Supreme Court recently remarked that parentheticals are often considered to be afterthoughts or asides, not major exceptions to well-established categorical bars like this one. That's Beckler v. Commissioner. You don't have to rely on that. No. I mean, just the negative implication of what Congress did in that provision was that it suggested that your interpretation now is unnecessary. I agree that it is — that under our interpretation, that parenthetical wouldn't have been necessary. But I think given that Congress was confronting a problem where a lot of people would no longer be refugees, they just wanted to make absolutely sure that in cases where somebody may have lost refugee status, they'd still be able to adjust. And I think just textually, it implies that the word granted — the phrase granted asylum encompasses those whose asylum was terminated. Otherwise, it would make no sense to allow adjustment for anybody granted asylum and currently has a grant of asylum, but that asylum was later terminated. But as you just said, this language already covers this, and so we don't need to add that clarification. I agree that in our view it's not necessary. It's belt and suspender, and that's consistent with its placement, sort of snuck in in a parenthetical after a provision that's really orthogonal to the key issue that Congress was dealing with. And so really what they were saying in your view is whether or not they still continue to meet the eligibility requirements for the refugee status, which is now a condition. I think everybody agrees that even if your asylum has been terminated, you still have to be able to show that you meet the prerequisites for asylum in order to be eligible under the statute for adjustment. That's correct. And I see my time has run out. I don't want to — You can wrap up. Take a few more minutes. Okay. Yeah. So I think — I think — well, I think that is correct. I think the 1990 statute, to the extent it bears on this question, it all does support Petitioners. But the clearest signal of what Congress was trying to do here is in Section 1159. And with that, I'll reserve a matter of my time for rebuttal. You're reserved a few minutes for rebuttal. Thank you. We'll hear from the government. Good morning, Your Honors. May it please the Court, Jessica Burns on behalf of the Attorney General. By being granted asylee status, an asylee is given the privilege of the opportunity to apply for adjustment of status. And the only way to do that is through 1159B. But the termination of asylee status interrupts that path. It has consequences, and one of the consequences is that you no longer get to adjust under that provision. An asylee doesn't retain the ability to adjust forever simply by virtue of previously been granted asylum. Again, 1159B is the sole way for an asylee to adjust to a lawful permanent resident. And the statute focuses on, and what we're discussing today is, what does the status of any alien granted asylum mean? Can I ask you one thing that's interesting? I think this ties in with the conversation I was having with your counterpart. In B-3, one of the requirements for the ability to adjust is that you continue to be a refugee within the meaning of 1101A, 42A, which means you have a well-founded fear of being raised with a refugee, et cetera. That's a curious way of describing that continuing requirement if it's synonymous with continues to have the status of an asylee, because it seems to me the status of an asylee is those things are true, and you haven't been terminated for some of these extrinsic reasons. And so I'm trying to figure out why Congress would have described that continuing requirement in a more narrow way rather than just say continues to be an asylee. When the Refugee Act of 1980 was enacted, there was only one ground for termination of asylee status, and that was no longer being a refugee. And so when you compare that with the preceding section, both required continuing refugee status. It was only later that Congress expanded the requirements, I mean, the grounds for termination and added several other grounds for termination. So they're sort of residual. They didn't update the statute. And they never updated the statute to require continuing asylee status. When I look at the regulation, the implementing regulation, which is enacted by the agency that's applying this, it says, except as provided in 8.2 or 8.3, the status of any alien who has been granted asylum in the United States may be adjusted. So it inserts the missing words here, right? Because I think the fight is, is the missing words has been at some time in the past or is still being, as if granted is something that happens in an ongoing way. Doesn't the fact that that's how the regulation supplies the missing word tell us something about at least what the agency, when it enacted this regulation, understood this to mean? Well, I think that's certainly a plausible reading. I think when we go back to the text of the actual statute, it only discusses two statuses, asylee status or status of alien granted asylum and lawful permanent resident status. Non-LPR status or no status is not a status. And so by petitioner's reading, it really negates the use of the word status completely and makes it superfluous. So we shouldn't look at that. So you shouldn't give the enacting regulation weight in helping us to understand what those words in the statute mean here? I think that it doesn't outweigh the plain text of the statute itself, which should always be the first thing that we look at. And multiple courts have construed the language the same way, that if you are granted asylee status and you adjust to a lawful permanent resident, you don't permanently retain that asylee status. It goes away. You don't retain the benefits that come with that. And in the same way, when asylee status is terminated, you don't permanently retain the benefits that asylee status conveys. The Fourth Circuit, the Fifth Circuit, and the Ninth Circuit have all agreed with that, as has the Board of Immigration Appeals. And I think the most significant thing — I mean, you're right on the sort of — in a different context. Correct. But am I wrong in understanding that in the circuit split, the Fifth Circuit lines up with your friend to your left? Yes. Yes, Your Honor. But, I mean, certainly these are two plausible readings of the statute, whether or not it's a permanent benefit to an asylee. But we believe that the Fourth Circuit and the Board of Immigration Appeals is the best reading of the statute. When the court — when the Fifth Circuit looked at this issue, it wasn't — the board didn't really provide any analysis, and the government actually requested remand on that issue, which the Fifth Circuit denied. So the Fifth Circuit didn't have the benefit of the full briefing of the issue. And the Fifth Circuit myopically focused on the absence of the termination clause that's present in 1159A and missing in 1159B. They never grappled with the actual words of the statute in the issue of statutory construction. They never examined what does status mean and what does status in alien-granted asylum mean. And because of that, we believe that the Fourth Circuit and the Board of Immigration Appeals has the best reading of the statute because they look at the statutory language itself without just focusing on other parts of the INA. When you say they're both plausible readings, and I forget, are you — is it your position that it's ambiguous or that it's permanent? We think that the plain language controls here. However, if the court were to find it ambiguous, we think that the board's reading is reasonable for all the same reasons we believe that it is based on the plain language and would ask that the court grant deference to the board's reading. So you think that they're both plausible readings? Like, I might have heard that as saying it is ambiguous because if there are two very different but both plausible readings, that feels like kind of definitional ambiguity. Again, because the Fifth Circuit's analysis comes from an ancillary part of the statute but not the actual language of the statute itself, we think that it's an incorrect reading of the statute. Again, they only focus on the prior provision and don't — the court didn't look at the language of the statute itself. And so, therefore, we think the plain language governs here. However, again, if the court were to find it's ambiguous, we would ask for deference to the board's interpretation. Do you — does the government take the position that an IJ in a removal context where there's a petition for removal based upon loss of asylum status or someone who enjoys asylee status commits a serious offense, like one of the fellows here in this case? And so there's a petition to take away their asylum status and or remove them from the country, right? And if he had made an application to convert or to adjust to lawful permanent residency at that time, is it the government's view that the IJ did have the ability to consider the application for adjustment of status prior to the termination determination? Yes. There's board precedent on this issue. I'm forgetting the name of the case. It's a matter of — is it AK? But, yes. But also — That's not what happened to Mr. Wasiley. Mr. Wasiley's termination or loss of asylum status and didn't make an application for adjustment of status until the second time around, right? Yes, Your Honor, but — And so let me ask you this. How do we understand what's the difference of Mr. Wasiley the second time around? He's still Mr. Wasiley. It's still the same crime. But the IJ then took a look at who Mr. Wasiley was, how long he'd been in the United States, the nature of his crime. They had a much better handle on what the crime was. And even though he'd been deemed removable, the IJ decided to grant him adjustment and removal. But within that same proceeding, the BIA said that was it, right? Correct. Doesn't that strike you as an incredibly odd result where — and the first time around, if he'd been lawyered up and had a really good lawyer, the BIA recognizes that they could have adjusted his status, notwithstanding the nature of his crime, the fact that he was eligible to lose his asylum status, the fact that he faced being deported, removed from the country, that that's okay. But in the second instance, when nothing's changed, he can't? Doesn't this — doesn't that kind of make an ass of the law? Well, the termination of asylum status is also discretionary and in the discretion of the IJ. It's not required for an IJ to terminate. What I'm trying to understand is what's the magic there? What's the magic in one as opposed to the other? I mean, what's the difference? And I suppose the answer is because the statute requires it. That's not your fault. You didn't enact the statute. I mean, immigration law is just not an easy thing to come to grips with at times. It isn't. And I think that inherent in so much of immigration proceedings, there is a lot of discretion in the hands of the immigration judge. There's discretion to terminate asylum. In this case, there was discretion whether or not to actually terminate asylum status. Again, that's not required by the statute. It's discretionary. And then there is discretion in the order that you adjudicate. Should we err on the side of allowing the Attorney General to exercise his discretion? I mean, I believe that that's what we're asking. Isn't the underlying power the delegation of authority to the Attorney General to exercise his or her discretion with regard to immigration matters? Yes, Your Honor. I mean, it's kind of an unusual grant of authority in terms of governing the country. And immigration is kind of seen as a separate kind of unique kind of circumstance, right? Yes. Okay. And I... Just so I can... Because I'm not sure what it means. I want to make sure I'm following that thread. There's deference to the AG in terms of determining what the rule means, sort of Chevron kind of deference. And that may be what you were saying. But there's also the question of shouldn't we understand a statute in a way that it doesn't tie the AG's hands to exercise discretion in individual cases, right? So your friend says, well, even if he's eligible for adjustment, there's still all these hoops he has to go through. And Petitioner's interpretation here gives the AG the opportunity to balance all these factors, whereas your interpretation is an across-the-board disqualification. Well, respectfully, I disagree with your characterization of the government's position because the termination clause is ultimately discretionary and in the immigration judge's discretion. So an immigration judge can look at the facts of the case and see what's happening and either not terminate asylee status whatsoever or can adjudicate the adjustment application prior to terminating asylee status. So it gives the immigration judge a lot of discretion. And I don't think that there's anything that limits the government's interpretation in that regard. And another point that I think is really important to focus on is Petitioner's reading of the statute completely negates the effects of termination of asylee status. Why would Congress provide all these provisions that terminate asylee status if it was not meant to have any effect? Why would the immigration judge and the Board of Immigration Appeals have to adjudicate these termination requests in USCIS if it had no practical effect? It's also right if he doesn't get his adjustment of status, he's going to get removed, right? But, I mean, he's here without status, and, I mean, that doesn't negate the revocation of asylee status. Well, it certainly renders somebody removable, but if you can just apply for adjustment, it really diminishes the purpose of creating a termination clause. You could envision another way that Congress would have drafted this statute if the only consequence of termination was that it rendered somebody removable. And by providing termination of asylee status, Congress must have intended for it to bear some consequences, the most significant of which would be losing the opportunity to apply for lawful permanent resident status. I mean, in the normal course, somebody gets asylum. They come to the United States either as a refugee or they come and they stay on a visa and then they overstay. You know, they come and visit. They enter one of two, generally one of two ways, and then if they enter as a refugee, they've already presented themselves to the country at the border and said, please take me in because I'm being persecuted at home, right? The other side is they come in legitimately, and then when they're found or someone says, you're headed back, they say, wait a second, if I go back, I'm going to be persecuted, right? And so there are two avenues to asylum application. When one loses asylum status, they don't get to stay, right? Correct. They're going. And so just losing the status doesn't mean that things just keep going on. They're now inserted into a removal process or they're removal eligible. They might lose it and then disappear. Correct, Your Honor. They might be out on bail or they may not be in custody, and so there may be another period of time. But they're here now illegally, correct? Correct. And one final point that I wanted to make is that the government's reading of the statute comports with adjustment generally. When you adjust under Section 1255, you have to go from one status to another. Usually it's a grant of a visa, right, an employment-based visa, a family-based visa. If that employment ends, you don't still get to adjust to a lawful permanent resident, right? All of these adjustment provisions really envision a path, and when that path is broken, you lose the opportunity to adjust on that ground. Thank you. Thank you, Your Honors. Thank you, counsel. We'll hear about it. Thank you, Your Honors. The government, I think, acknowledged the arbitrariness of the rule that it is endorsing, especially as applied in Mr. Wassily's case, where had the I.J. just adjudicated adjustment first, that Mr. Wassily would not be facing deportation to Egypt where he fears persecution, where the I.J. found he feared persecution based on his Christian faith. The government defended that only by saying the statute requires it, based largely on the word status. That is simply not correct. Two circuit courts, the Fifth and the Ninth, in the adjusting status alone have held that in the INA, status refers to unlawful and lawful status. This Court in Adams ---- What do you do about the person who disappeared for 10 years after their asylum status is taken? I mean, I'm ---- it's obvious that I have a ---- I'm having a problem with the problem of Mr. Wassily. But what about the person, the rule is, the rule you want is much bigger than that. No, no ---- The rule is so much more forgiving because of your language. But the rule is not going to allow anybody in this country to obtain adjustment on its own. It will have to be a discretionary decision, usually waiving. That person will need to show humanitarian, family unity, or public interest concerns that outweigh the misconduct that they engaged in by absconding by ---- So you're arguing that we understand that language to be consistent with the discretion granted to the attorney general to decide who stays and who goes. That's exactly right. And it's a special ---- I think that Congress clearly sought to advance that discretion there. And the government's rule would eliminate that discretion based solely on the happenstance of timing of the termination decision. And ---- Can you explain that a little bit? Is that some kind of canon of construction, that when there's discretion, you err on the side of allowing the discretionary decision? I don't think it's a generally applicable rule. But I think it's context clues from this particular statute where we know that Congress, in cases of serious misconduct that would render somebody inadmissible under B-5, still did want the attorney general to be able to adjust status, notwithstanding that misconduct. So it's not a general principle that you err on the side of discretion. But I think it makes better sense of this particular statutory scheme as Congress enacted it. And I just want to turn quickly, though, to the government's last point regarding how adjustment typically works. That's, I think, just not true. There are several points where Congress has expressly authorized adjustment from an explicitly unlawful status to a LPR status. I think 1255c2 is the clearest, where Congress first barred adjustment for those in, quote, unlawful immigration status, which, just bracketing, that if that were already the rule, that would be completely superfluous. But then it goes on to say that for an immediate relative of a U.S. citizen who is in unlawful immigration status, the attorney general still may adjust their status to LPR status. And there are other provisions we cite where that's equally true. So I just don't think there's anything to the rule the government's arguing for that adjustment implies some preexisting lawful status. For those reasons, we would ask the Court to grant the petitions for review, vacate the petition below, and remand for the agency to consider these adjustment applications in the first instance. Thank you. Thank you, Your Honor. Thank you both. We'll take the case. Thank you both.